IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| MERITA DIANE BAREFOOT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 1:13-cv-841-CSC |
| | ) | (WO) |
| CAROLYN W. COLVIN, | ) | |
| ACTING COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

**I. Introduction.**

The plaintiff filed an application for a period of disability and disability insurance benefits pursuant to Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.*, alleging that she was unable to work because of a disability. Her application was denied at the initial administrative level. The plaintiff then requested and received a hearing before Administrative Law Judge ("ALJ") Tracy S. Guice. Following the hearing, the ALJ also denied the claim. The Appeals Council rejected a subsequent request for review. The ALJ's decision consequently became the final decision of the Commissioner of Social Security (Commissioner).[1] *See Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The case is

---

[1]Pursuant to the Social Security Independence and Program Improvements Act of 1994, Pub. L. No. 103-296, 108 Stat. 1464, the functions of the Secretary of Health and Human Services with respect to Social Security matters were transferred to the Commissioner of Social Security.

now before the court for review pursuant to 42 U.S.C. §§ 405 (g) and 1383(c)(3).[2]  Based on

the court's review of the record in this case and the briefs of the parties, the court concludes

that the decision of the Commissioner should be reversed and the case remanded to the

Commissioner with instructions to award benefits to the plaintiff.

## II.  Standard of Review

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the

person is unable to

> engage in any substantial gainful activity by reason of any medically
> determinable physical or mental impairment which can be expected to result
> in death or which has lasted or can be expected to last for a continuous period
> of not less than 12 months.

To make this determination[3] the Commissioner employs a five step, sequential

evaluation process.  *See* 20 C.F.R. §§ 404.1520, 416.920.

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific
> impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next
> question, or, on steps three and five, to a finding of disability.  A negative
> answer to any question, other than step three, leads to a determination of "not
> disabled.

---

[2]Pursuant to 28 U.S.C. § 636(c), the parties have consented to entry of final judgment by the United States Magistrate Judge.

[3]A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).[4]

The standard of review of the Commissioner's decision is a limited one.  This court must find the Commissioner's decision conclusive if it is supported by substantial evidence. 42 U.S.C. § 405(g); *Ingram v. Comm. of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158-59 (11th  Cir. 2004).  A reviewing court may not look only to those parts of the record which supports the decision of the ALJ but instead must view the record in its entirety and take account of evidence which detracts from the evidence relied on by the ALJ.  *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).  The court "may not decide the facts anew, reweigh the evidence, or substitute  . . . [its] judgment for that of the [Commissioner]."  *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n.8 (11th Cir. 2004) (alteration in original) (quotation marks omitted).

> [The court must, however,] . . . scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] . . . factual findings . . . No similar presumption of validity attaches to the [Commissioner's] . . . legal conclusions, including determination of the proper standards to be applied in evaluating claims.

*Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

---

[4]*McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986) is a supplemental security income case (SSI). The same sequence applies to disability insurance benefits.  Cases arising under Title II are appropriately cited as authority in Title XVI cases. *See e.g. Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981) (Unit A).

### III.  The Issues

**A.  Introduction.**

Barefoot was fifty-three years old on September 30, 2006, her date last insured.  (R. 32).  She has a twelfth grade education.  (R. 32).  Her work experience includes work as a bookkeeper in a medical office and part-time work at a plant nursery.  (R. 33).  Following the administrative hearing, the ALJ concluded that, from the date of the alleged onset of disability (January 1, 2000) through the date last insured, Barefoot had the following severe impairments: history of breast cancer with bilateral mastectomies; history of diabetes insipidus secondary to pituitary disorder, benign; status post gallbladder surgery; and history of upper respiratory infections.  (R. 18).  The ALJ concluded that Barefoot was unable to perform her past relevant work.  (R. 22).  Nonetheless, the ALJ concluded that Barefoot was not disabled because, through her date last insured, she had the residual functional capacity to perform other work that is available in the national economy.  (R. 22).

**B.  The Plaintiff's Claims.**  As stated by the plaintiff, her claims are

1. Whether the ALJ erred in failing to consider the August 13, 2012 opinion (R. 341-42) of Dr. McClintock, Barefoot's former physician and former employer, that Barefoot was disabled during the relevant period.

2. Whether the ALJ's assessment of Barefoot's residual functional capacity is based on substantial evidence; and

3. Whether new and material evidence warrants remand.

Because the court's consideration of the second issue leads to the conclusion that this case must be reversed and remanded for an award of benefits, the court pretermits

4

consideration of the remaining issues raised by the plaintiff.

## IV.  Discussion

A disability claimant bears the initial burden of demonstrating an inability to return to his past work.  *Lucas v. Sullivan*, 918 F.2d 1567 (11th Cir. 1990).  In determining whether the claimant has satisfied this burden, the Commissioner is guided by four factors: (1) objective medical facts or clinical findings; (2) diagnoses of examining physicians; (3) subjective evidence of pain and disability, *e.g.*, the testimony of the claimant and his family or friends; and (4) the claimant's age, education, and work history.  *Tieniber v. Heckler*, 720 F.2d 1251 (11th Cir. 1983).  The ALJ must conscientiously probe into, inquire of and explore all relevant facts to elicit both favorable and unfavorable facts for review.  *Cowart v. Schweiker,* 662 F.2d 731, 735-36 (11th Cir. 1981).  The ALJ must also state, with sufficient specificity, the reasons for his decision referencing the plaintiff's impairments.

> *Any* such decision by the Commissioner of Social Security which involves a determination of disability and which is in whole or in part unfavorable to such individual *shall contain a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating the Commissioner's determination and the reason or reasons upon which it is based.*

42 U.S.C. § 405(b)(1) (emphases added).  Within this analytical framework, the court will address the plaintiff's argument that the ALJ's decision is not supported by substantial evidence.

## A.     Facts and Procedural History

In 1979, Barefoot began working as a bookkeeper for the medical practice of Dr.

5

Richmond C. McClintock, Jr., M.D., who also served as one of her physicians.  (R. 342).

In 1982, Barefoot was diagnosed with an inoperable hormone-secreting benign pituitary tumor for which she prescribed DDAVP (desmopressin), which she must continue to take for the rest of her life.  (R. 44-46, 298, 341, 395, 406-409).  DDAVP controls the damage the tumor causes to the brain.  (R. 241).  As a result of the tumor, Barefoot has diabetes insipidus, a condition that causes frequent urination and which is also controlled by DDAVP.  (R. 260, 374, 408). According to Dr. McClintock, side effects of DDAVP include vertigo and changes in vision.[5]  (R. 341-42).   In addition, most commonly-prescribed medications will interrupt the effectiveness of DDAVP.  (R. 341-42).  Despite the side effects of her medication, Barefoot's physicians have instructed her to take whatever dosage of DDAVP is appropriate to control her diabetes insipidus and pituitary tumor, and the necessary dosage may fluctuate.  (R. 35-36, 45-46, 408).  Due to her diabetes insipidus, Barefoot must have constant access to drinking water.  (R. 45, 406).

At the October 1, 2012 administrative hearing in this case, Barefoot provided the following testimony regarding the side effects of using of DDAVP to control her pituitary

_____

[5]On appeal, Barefoot alleges that the ALJ erred by not considering whether vision changes were an impairment (either severe or non-severe) during the relevant time period.  (Doc. 11 p. 9).  However, in the record before the ALJ, although Barefoot alleged that DDAVP had caused her vision changes in the past, she did not allege that it had done so during the relevant time period. The medical record (R. 395) confirms that, prior to the alleged disability onset date, Barefoot did suffer from changes in vision, but, after the disability onset date, Barefoot did not seek medical treatment for changes in vision.  Because there was no evidence and no allegation that Barefoot suffered vision changes as a side effect of her medication during the relevant time period, the ALJ did not err by failing to consider whether vision changes were an impairment during that time period.  *See* 20 C.F.R. §404.1545(a)(2) ("We will consider all of your medically determinable impairments *of which we are aware*, including your medically determinable impairments that are not 'severe,' . . .  when we assess your residual functional capacity." (emphasis added)).

tumor and diabetes insipidus:

ALJ:        Then, there's also a reference, in 2001, to insipidus diabetes mellitus. Were you diagnosed with diabetes? Were you placed on insulin or a pill? Do you still have diabetes?

Barefoot:   No, ma'am. It was diabetes insipidus, which is the result . . . of the brain tumor. And, any kind of medications that I take – sinus medications, antibiotics, steroids – will affect this medication that I use. So, the – any type – chemo medicine or anything that they gave me new can change the effect on it, either -- it makes it not work as well as it's supposed to or it makes it work differently. . . . The pituitary – the DDAVP affects your vision. It affects your balance.  It – it's a day to day thing. If it – if it's not working, you're going to the bathroom -- it's like an anti-diuretic. You're going to the bathroom approximately every 20 minutes. You're drinking enormous amounts of fluids[.]

(R. 35-36).

ALJ:        Okay. Now, tell me about problems with your pituitary gland . What problems, if any, were you having between 2000 and 2006 with your pituitary?

Barefoot:   The same problems that I have today. . . . It is a daily maintenance. I have to worry about – if I go somewhere, I have to have the medicine with me, if I'm going to be gone longer than an hour or so.

I have – the medicine is affected by anything that I – medicines that I take. I'm not aware of foods. If you have sinus drainage or anything, the medicine is not effective. Too much medicine makes you have runny nose and sinus drainage, so you balance out the two.

If you use too much medicine, you retain too much fluid. So, it's really a medicine that I maintain daily. It's how it works. I can tell, one trip to the bathroom, if I need to take the medicine. I have about 20 minutes to either take medicine or either -- I'm in the cycle of going to the bathroom and drinking excessive

liquids. So, if I work somewhere, I've got to have access to medicine in – that stays in the refrigerator or either a bathroom and water or fluid to drink. And, this has been going on for 30 years.

ALJ:        Now and – so, let me look at this date. On Exhibit F-10, in page 6 and page 7, you were seeing Dr . Hewitt for a pituitary tumor, in April, 2001. Is that right? What did he do? He -- what kind of doctor was he? . . . .

Barefoot:   That's when I had the problems that –  I became extremely dehydrated, and the medicine was not working. The pituitary medicine was not working. And, I was throwing up liquids, anything that I drank, and I was in the hospital for that.

ALJ:        At any time after that, did they get your pituitary tumor under control, the problems with it?

Barefoot:   It was – it was a – like I said, day to day regular thing. I -- Dr. Cook – I talked to him about it, and if I had it under control, then he considered it - - that we were doing well, because it was not something that you can say, You take this once a day or you take it twice a day. You have to take it p.r. n ., as needed. And, it affected hormones. I no longer had periods; could not have any more children. We – I might have a period now. I might have one in two years. I might have one in – in three or four years. That's why Dr. McClintock referred to it; it could be everything could be approximately hormone related because it was a hormone-secreting tumor. And the breast cancer was hormone . The . . . uterine cancer was hormone.  And, the [ovarian] cancer I have now is hormone cancer.

(R. 44-46).

    In 1987, Barefoot was diagnosed with breast cancer for which she received chemotherapy and was prescribed Tomoxifen, which she continued to take through her date last insured to prevent recurrent breast tumors.  (R. 34-35, 260, 298, 323, 341, 395).

8

By late 1999, after undergoing several surgeries, including breast reconstruction surgeries, Barefoot's prescribed medications had changed, and this in turn caused the effectiveness and side effects of DDAVP to fluctuate.  (R. 34, 36, 341).  As a result, Barefoot began having problems maintaining attendance at work, remaining alert, and focusing.  (R. 34-35).  Barefoot alleged that the DDAVP adversely affected her balance, and on some days she needed to urinate frequently.  (R. 35-36, 44-46).  Therefore, on January 1, 2000, Barefoot resigned from her position as a bookkeeper because she felt she could no longer adequately perform her work responsibilities due to the fluctuating  side effects and effectiveness of DDAVP.  (R. 34, 341).  At that time, Dr. McClintock advised her to apply for disability benefits, but she did not because she hoped her condition would improve.  (R. 47).

On April 17, 2001, Barefoot was admitted to the hospital with fever, nausea, vomiting, and diarrhea.  (R. 46, 349-54).  She was having difficulty with her DDAVP, and her urinary output had increased due to apparent ineffectiveness of the medication in the previous 24-48 hours.  (R. 350).  She was diagnosed with urosepsis secondary to Klebsiella infection, diabetes insipidus, and hyperglycemia.  (R. 354).

In 2001, Barefoot earned $1400 as a self-employed bookkeeper, when she did some "minimal" work for Dr. McClintock.  (R. 37).

On April 24, 2004, Barefoot was admitted to the hospital, where her gallbladder was surgically removed after she was diagnosed with cholecystitis.  (R. 326, 371).

On April 30, 2004, Dr. Roddy Cook treated Barefoot for dizziness that was

9

"aggravated by movement, lying flat and upward gaze." (R. 364). Dr. Cook diagnosed benign positional vertigo. (R. 364). He noted that Barefoot was "doing extremely well" with her recovery from gallbladder surgery, and that "she has a history of vertigo in the past." (R. 364). Dr. Cook's medical records prior to Barefoot's onset date confirm Barefoot's history of vertigo. (R. 394).

In 2005, Barefoot began working part-time at a plant nursery. (R. 36-37, 39). At the administrative hearing in this case, Barefoot gave the following testimony regarding her attempt to work at the plant nursery:

> Barefoot:     [T]hat was the nursery work, and I worked part time. He let me work the days that I was able to work. He let me work inside if I was not able to work outside. He let me work –  he was just working around my schedule, but I could not hold down a full-time job and say, "Yes, I'll be there today," or "Yes, I'll be there tomorrow."

(R. 36-37).

Barefoot's former employer provided the following letter, which confirmed that he allowed her to work part-time whenever she was physically able to do so:

> Merita Barefoot was a part-time employee with D&J nursery.  She began working a couple hours a week in 2005-2006.
>
> During this time she had numerous health problems that prevented her from being able to work full time.  She was allowed to work inside planting and also store pricing when she was not able to work outside.  She worked with customers, potted plants, help[ed] maintain greenhouses.
>
> It was obvious that she was willing and wanted very much to work, but her health would not permit her to do so.  She was a valuable employee to me[,] especially her organization and bookkeeping skills.

Her last date of employment with D&J was March 9, 2006.

(R. 216).

On September 15, 2005, Dr. Cook treated Barefoot for an upper respiratory infection. (R. 324). Barefoot also had a urinary tract infection at the time. (R. 324). On that day, Dr. Cook noted: "She is working at a nursery and is keeping her weight down. She is feeling well otherwise." (R. 324). On September 19, 2005, Dr. Cook treated Barefoot for sinusitis. At that time, Dr. Cook noted that Barefoot "discussed leaving off the Tamoxifen that she has been on for about 16 years, but she does not want to do that at this time. . . . She uses DDAVP spray about every 20 hours and she has been stable on this for quite some time." (R. 323). On October 23, 2005, Dr. Cook again treated Barefoot for a sinus infection. Dr. Cook noted that Barefoot was "generally doing well otherwise." (R. 322).

After her date last insured, Barefoot was diagnosed with metastic ovarian cancer which, in October 2012, a physician opined was a "terminal illness with an expected survival of less than one year." (R. 374). In reviewing the decision of the ALJ, the court will not consider this or other severe impairments that began after September 30, 2006, Barefoot's date last insured.

At the October 1, 2012, administrative hearing, the ALJ inquired about Barefoot's daily activities during the relevant time period, as follows:

ALJ:     Did you have chores or things around the house that you took care of? Did you dust, sweep, mop, vacuum, do the laundry, things of that nature?

11

Barefoot:      Yes.

ALJ:           Okay.  And, did you have a driver's license during that period
               and, if you did, did you also drive?

Barefoot:      Yes, except on days when I had problems with the DDAVP, the
               desmopressin, from the brain tumor.  Hazy weather and – can
               affect my balance.  I have vertigo, and it's mainly – it's not like
               just regular vertigo.  It's mainly caused by that medicine, and it
               will cause you to have that . . . . So, there were good days when
               I could drive, like, if my husband needed something at a job site.
               I could go take it to him but, then, there were days where I was
               not able to drive, to do that.

ALJ:           Okay.  And, did you take care of your own personal needs?  In
               other words, were you able to dress and bathe yourself?

Barefoot:      Yes, Ma'am.

(R. 401-41).

At the hearing, the ALJ asked the vocational expert ("VE") the following question:

[L]ets assume I find the claimant's testimony to be fully credible, and that
during the period at issue, from January of 2000 through September of 2006,
an individual with the claimant's age, education, and vocational experience did
not have the necessary stamina to complete an eight-hour work day without the
need for frequent rest breaks every hour; would not be able to sustain
concentration, attention for two-hour periods; would also miss two or more –
have two or more unplanned absences per month because of residuals from the
medical condition that she's testified to.  An individual with these limitations
– would that individual be able to perform the claimant's past work or any
other work in the national or regional economy?

( R. 50-51).

The VE replied: "No, ma'am."  (R. 51).

**B.      The Decision of the ALJ is Not Supported By Substantial Evidence and Is Not Consistent With the Applicable Legal Principles**

An ALJ "must consider a claimant's subjective testimony of pain if she finds evidence of an underlying medical condition, and either (1) objective medical evidence to confirm the severity of the alleged pain arising from that condition, or (2) that the objectively determined medical condition is of a severity that can reasonably be expected to give rise to the alleged pain." *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995). "A claimant's subjective testimony supported by medical evidence that satisfies the pain standard is itself sufficient to support a finding of disability." *Id*. at 1561. The ALJ may reject the claimant's complaints of pain as not creditable, "and that determination will be reviewed for substantial evidence." *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992). "If the ALJ refuse[s] to credit subjective pain testimony where such testimony is critical, he must articulate specific reasons for questioning the claimant's credibility." *Id*. "Failure to articulate the reasons for discrediting subjective pain testimony requires, as a matter of law, that the testimony be accepted as true." *Foote*, 67 F.3d at 1562.

It is undisputed that Barefoot was disabled during the relevant time period if, according to her subjective testimony at the hearing, she "did not have the necessary stamina to complete an eight hour work day without the need for frequent rest breaks every hour, would not be able to sustain concentration [and] attention for two-hour periods," and "would have two or more unplanned absences per month" due to her medical condition. (R. 50-51). The ALJ did find that Barefoot had "medically determinable impairments [that] could

13

reasonably be expected to cause the alleged symptoms," (R. 21), and the record supports this finding.  Therefore, the ALJ was required to consider the credibility of Barefoot's testimony. *Marbury*, 957 F.2d at 839.  In this case, the ALJ did not find Barefoot's testimony to be credible with respect to her need for take frequent rest breaks and her inability to complete an eight-hour work day, sustain concentration and attention, and have no more than one unplanned absence from work per month.   The ALJ based this credibility finding on Barefoot's "daily activities, working part-time, and the fact that [her] cancer was in remission during the relevant period."  (R. 21; *see also* R. 19-20).  With respect to these three factors, the ALJ's representation of the record and her factual findings are fundamentally flawed, totally unsupported by the record, and inconsistent with the governing legal principles.

## 1.    The ALJ's Conclusion Based on Barefoot's Daily Activities Is Not Supported By Substantial Evidence

With respect to Barefoot's daily activities, the ALJ noted that Barefoot "was able to complete household chores" and that "she could drive and take care of her personal needs without assistance."  (R. 19-20).  The ALJ concluded that "Barefoot has described daily activities, which are not limited to the extent one would ex[pec]t, given the complaints of disabling symptoms and limitations."  (R. 20).

However, "an applicant need not be completely bedridden or unable to perform any household chores to be considered disabled," *Easter v. Bowen*, 867 F.2d 1128, 1130 (8th Cir. 1989), and "participation in everyday activities of short duration, such as housework . . ., [does not] disqualif[y] a claimant from disability." *Lewis v. Callahan*, 125 F .3d 1436, 1441

14

(11th Cir. 1997).  At no time was Barefoot's testimony regarding her ability to drive, care for her personal needs, and perform simple household chores in any way inconsistent with her allegations regarding need for frequent water and restroom breaks, inability to maintain concentration and attention for two-hour periods, and inability to maintain work attendance at a full-time job with no more than one absence per month.  Barefoot clearly testified that she was only able to drive "on good days," but not on days when the side effects of her medications caused vertigo that prevented her from doing driving.  (R. 41).  Barefoot's unembellished statement that she could care for herself and perform simple household chores like mopping and dusting did not indicate that she could perform those activities with normal concentration and attention for two-hour periods, or at an uninterrupted pace consistent with regular, full-time work on a daily basis.  (R. 40-41).  Moreover, Barefoot testified that her daily activities were interrupted by the need for frequent water and restroom breaks and that she sometimes needed to stop her activities to take her medication, and the need for such breaks is confirmed in the medical record.  (R. 35-36, 44-46, 406, 408).

Accordingly, the court concludes that neither substantial evidence nor the applicable law supports the ALJ's conclusion that Barefoot's reported daily activities undermine her credibility.  *See Parker v. Bowen*, 793 F.2d 1177, 1180 (11th Cir. 1986) (holding that the Appeals Council erred by relying upon a claimant's ability to perform "simple household chores" to discount her subjective testimony while ignoring uncontradicted evidence that the claimant's fatigue, difficulty standing, and blurred vision significantly affected her daily

15

activities); *see also Smith v. Califano*, 637 F.2d 968, 971 (3rd Cir. 1981) ("Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity."); *Bennett v. Barnhart*, 288 F. Supp. 2d 1246, 1252 (N.D. Ala. 2003) ("It is the ability to engage in gainful employment that is the key, not whether a plaintiff can perform minor household chores or drive short distances.").

**2.    The ALJ's Conclusion About Barefoot's Part-Time Work at a Plant Nursery Is Not Supported By Substantial Evidence**

The ALJ found that Barefoot's past part-time[6] work activity at the plant nursery was "inconsistent with her allegations of disability during the relevant period." (R. 18-19, 21). In support of this statement, the ALJ quoted those portions of the nursery owner's letter that recounted Barefoot's specific work activities (such as potting plants and assisting customers) and her skill as a bookkeeper, but omitted those portions of the letter that were directly relevant to Barefoot's allegations regarding her inability to sustain concentration and maintain a regular work schedule, such as the statement that Barefoot only worked "a couple of hours a week" due to her health issues. (R. 17-18, 216).  Even though Barefoot was allowed to work inside when she was unable to work potting plants outdoors, the omitted portions of the nursery owner's letter confirm Barefoot's testimony that she was nevertheless able to work only sporadically.  (R. 17-18, 216).  The ALJ erred as a matter of law by

---

[6]In her opinion, the ALJ stated that, "at the hearing, [Barefoot] admitted that she worked part time as a nursery worker" and noted that the work was on a part-time basis for only a short time.  (R. 17, 21). However, elsewhere in her opinion, the ALJ incorrectly stated that Barefoot "testified that she worked as a landscape nursery [sic] from 1991 through 2006."  (R. 19).

selecting out-of-context statements from the letter to support her residual functional capacity and credibility determinations, while ignoring the rest of the letter, which actually confirms that Barefoot's work at the nursery was consistent with her testimony and inconsistent with the ALJ's residual functional capacity determination.  *See* 20 C.F.R. § 404.1520(c)(1) ("In evaluating the intensity and persistence of your symptoms, we consider *all* of the available evidence, including . . . statements from . . . other persons about how your symptoms affect you." (emphasis added)); 20 C.F.R. § 404.1545(a)(1) ("We will assess your residual functional capacity based on *all* the relevant evidence in your case record." (emphasis added)).

Moreover, because Barefoot only performed the work activities described in the letter for "a few hours per week" on an unpredictable schedule limited by her physical ability (R. 36-39, 216), there is no evidentiary basis for concluding that her work activities at the nursery were inconsistent with her reported inability to concentrate, need for frequent rest breaks, inability to maintain concentration, and inability to maintain work attendance at a full-time job with no more than one absence per month.  Therefore, substantial evidence does not support the ALJ's decision to discredit Barefoot's testimony on the basis of her ability to perform certain tasks on a part-time basis at the plant nursery.  *See Foote v. Chater*, 67 F. 3d 1553, 1561-62 (11th Cir. 1995) (holding that an ALJ's decision to discredit a claimant's subjective testimony must be based on explicitly-stated, adequate reasons that are supported by substantial evidence); *see also Smith*, 637 F.2d at 971-72 ("It is well established that

sporadic or transitory activity does not disprove disability."); *Willem v. Richardson*, 490 F.2d 1247, 1248 & n.4 (8th Cir. 1974) (holding that the claimant's "'sporadic and transitory activities,'" including working part-time as a welding supervisor under terms of employment that had been modified to accommodate his medical condition, "'demonstrate[d] not his ability but his inability to engage in substantial gainful activity.'" (quoting *Wilson v. Richardson*, 455 F.2d 304, 307 (4th Cir. 1972)).

3.     **The ALJ Failed to Follow The Applicable Legal Standard In Considering the Medical Record Regarding Barefoot's Medically-Determinable Impairments, and Her Decision is Not Supported By Substantial Evidence**

The ALJ determined that Barefoot's "medically determinable impairments could reasonably be expected to cause the alleged symptoms."  (R. 21). As the ALJ noted, 20 C.F.R. § 404.1529 requires that, having made this determination, "[the ALJ] must then evaluate the intensity and persistence of [those] symptoms [to] determine how [those] symptoms limit [the claimant's] capacity for work."  20 C.F.R. § 404.1529(c); *see Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995).  In evaluating the intensity, persistence, and limiting effects of the objectively-determinable medical conditions, the ALJ must consider two types of evidence: (1) objective medical evidence, and (2) other evidence, such as "[t]he type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms."  20 C.F.R. § 404.1529(c).

The ALJ found that Barefoot's testimony as to the limiting effects of her impairments was not credible because the objective medical evidence showed that her "cancer was in

remission during the relevant period." (R. 21; *see also* R. 19). The ALJ's discussion of the objective medical evidence does articulate substantial evidence to support her finding that Barefoot's cancer did not recur during the relevant period, and also that Barefoot recovered well from gall bladder surgery, her upper respiratory infections were consistent with the ALJ's RFC assessment, and her pituitary tumor and diabetes insipidus were generally well-controlled with DDAVP. (R. 19-22). These facts are not in dispute.

What the ALJ completely failed to consider or mention *at all* in her opinion, however, was Barefoot's allegation that she was unable to concentrate, unable to drive consistently, unable to function normally on a daily basis, unable to work on a full-time basis, unable to work without frequent water and bathroom breaks, and unable to maintain a predictable work schedule *because of the side effects of the very medication that kept her underlying, objectively-determinable medical conditions well-controlled*. At the same time, the ALJ herself correctly and expressly acknowledged that, "*in addition to* the objective medical evidence," she was required to consider "other evidence" of the severity of Barefoot's impairments, including "the . . . side effects of any medication that the claimant takes." (R. 19 (citing 20 C.F.R. 404.1529(c)) (emphasis added).

Therefore, despite the fact that the objective medical evidence confirms Barefoot's underlying medical conditions were themselves generally well-controlled by medication during the relevant time period, the ALJ's failure to *also* take into account the side effects of Barefoot's medication – the primary basis of Barefoot's claimed incapacity to work – was

legal error. 20 C.F.R. § 404.1529(c)(3) ("[W]e will carefully consider any other information you may submit about your symptoms," including "[t]he type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms"); 20 CFR § 404.1545(a)(2) ("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe,' . . . when we assess your residual functional capacity."); *Gibson v. Heckler*, 779 F.2d 619, 623 (11th Cir. 1986) (holding that an ALJ must consider the disabling effects of "every impairment," singly and in combination with other impairments).

### 4.    As a Matter of Law, Barefoot Is Disabled

The record contains substantial evidence, including medical evidence, Barefoot's own testimony, and confirmation by a former employer, that Barefoot actually suffered from the alleged functionally-limiting side effects during the relevant time period.  (R. 35-36, 44-46, 216, 225, 241, 260, 297-99, 341-42, 323, 353, 364, 374, 394-95, 406, 408).  Contrary to the Commissioner's arguments, the medical record does *not* contain evidence that contradicts Barefoot's statements regarding the side effects of DDAVP.

The Commissioner argues that the record undermines Barefoot's credibility because, during the relevant period, the medical record demonstrates that Barefoot did not frequently seek treatment for the side effects of her medication.  However, the Commissioner fails to explain why Barefoot should complain to her doctor about known side effects of a medication that she must take for the rest of her life at the dosage required to control her

underlying medical condition. Moreover, as a matter of law, the extent and severity of the side effects of a medication are not, in and of themselves, a separate "medically determinable impairment" that must be independently diagnosed and objectively confirmed in the medical record. 20 CFR § 404.1529(c)(3) ("Since symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms," including "[t]he type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms"); see also 20 CFR § 404.1529(c)(2) ("[W]e will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."). In any event, however, the medical record does confirm that Barefoot took a medication that causes side effects such as vertigo, that she did suffer from vertigo, and that she needed frequent water and restroom breaks. (E.g., R. 341-42, 364, 394, 406).

The Commissioner argues that "the record is replete with notations from [Barefoot's] treating physicians and her own admissions that she was feeling fine during the relevant period, other than some coughing, congestion, and other cold-like symptoms." (Doc. 12 p. 11). In support of this contention, the Commissioner cites several out-of-context notations from the medical record. For example, the Commissioner cites a May 16, 2001, notation by Dr. Cook that Barefoot "was recently in the hospital. She is doing well now." (R. 367). In

fact, Barefoot had recently been released from hospitalization for acute pyelonephritis, septicemia, urinary tract infection, fever, nausea, dehydration, and vomiting stemming from a serious incident of DDAVP ineffectiveness. (R. 350, 352). On the day Dr. Cook noted that Barefoot was "doing well now," he also noted that she appeared to have a urinary tract infection as well as a sore throat, cold, and congestion. (R. 367). Thus, taken in context, Dr. Cook's notation that Barefoot was "doing well now" is clearly a statement about the conditions which caused her hospitalization, and it does not imply that, except for occasional sniffles, Barefoot "fe[lt] fine during the relevant period." (Doc. 12 p. 11).

The Commissioner also points out that, in April 2004, Dr. Cook found Barefoot was "doing extremely well" with recovery from her gallbladder surgery. However, Dr. Cook made this notation when Barefoot sought treatment for dizziness, which Dr. Cook diagnosed as benign positional vertigo, and he noted at the time that she had a history of vertigo.[7] (R. 364). Taken in context, this notation certainly does not support the Commissioner's argument that, during the relevant period, Barefoot felt perfectly fine except for occasional colds and respiratory infections. Instead, this medical record *confirms* Barefoot's allegation that she suffered from vertigo during the relevant period.

The Commissioner also points out that, on two occasions in the fall of 2005, Dr. Cook stated that Barefoot was generally doing well except for upper respiratory and urinary tract

---

[7]Dr. Cook's own medical records confirm Barefoot's history of vertigo. In 1994, Dr. Cook treated Barefoot for vertigo and noted at the time that she "has had a history of vertigo in the past but none this bad." (R. 394).

infections (R. 20, 322, 324), and on another occasion during the same time period he stated that Barefoot "had been stable on [DDAVP] for quite some time" (R. 323).  However, DDAVP is a medication taken to stabilize Barefoot's pituitary tumor and diabetes insipidus, and the dosage is adjusted as needed to keep those conditions stable, not on the basis of the medication's side effects.  (R. 35-36, 45-46, 408).  Dr. Cook considered Barefoot to be "doing well" if the medication kept Barefoot's pituitary tumor and diabetes insipidus stable and under control.  (R. 46).  Taken in context, Dr. Cook's comments on three particular days during September and October 2005 that she was "generally feeling well" and "doing well otherwise" and that her pituitary tumor was "stable on [DDAVP]" do not negate Barefoot's testimony that she suffered from side effects of medication throughout the relevant period.

In the typical disability case, a person's failure to seek treatment or complain of a symptom of a condition is a legitimate basis for the Commissioner to discount that person's credibility.  But that approach is not appropriate in this particular case.  Just as a person who has lost their sight would not complain about being blind every time that person visited her doctor, it is not rational to expect Barefoot to constantly complain about known, ever present side effects of a medicine which she must take to preserve her life.

The ALJ elicited uncontradicted evidence from the VE that, if Barefoot's allegations regarding the side effects of her medications are accepted as true, Barefoot was disabled during the relevant period.  (R. 50-51).  Because the record contains substantial evidence to support Barefoot's allegations regarding the severity, persistence, and functional limitations

caused by the medication that she took to control her pituitary tumor and diabetes insipidus, and because the record does not contain evidence contradicting those allegations, there is no basis for further factfinding by the Commissioner regarding the credibility of those allegations, and those allegations must be accepted as true. Therefore, the court concludes that, as a matter of law, Barefoot was disabled during the relevant period and that this case is due to be remanded for an award of benefits. *See Lewis v. Callahan,* 125 F.3d 1436, 1441 (11th Cir. 1997) (directing a remand to the Commissioner with instructions to award benefits where, as here, "there is simply no substantial evidence supporting the Commissioner's decision" and "[t]he evidence, in fact, strongly supports" the claimant's allegations regarding the limiting effects of his infirmities on his ability to work); *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993) (holding that remand for an award of benefits is appropriate where the Commissioner "has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt"); *see also Foote v. Chater*, 67 F.3d 1553, 1561-62 (11th Cir. 1995) ("[The ALJ's] [f]ailure to articulate the reasons for discrediting subjective pain testimony requires, as a matter of law, that the testimony be accepted as true.").

## V.   Conclusion

For the reasons as stated, the court concludes that the decision of the Commissioner should be reversed and that the case should be remanded to the Commissioner with instructions to award benefits to the plaintiff.

Further, it is

**ORDERED** that, in accordance with *Bergen v. Comm'r of Soc. Sec.*, 454 F.3d 1273,

1278 n. 2 (11th Cir. 2006), the plaintiff shall have sixty (60) days after she receives notice

of any amount of past due benefits awarded to seek attorney's fees under 42 U.S.C. § 406(b).

*See also Blitch v. Astrue*, 261 Fed. Appx. 241, 242 n. 1 (11th Cir. 2008).

The court will enter a separate final judgment.

Done this 7th day of January, 2015.


          /s/Charles S. Coody
CHARLES S. COODY
UNITED STATES MAGISTRATE JUDGE